# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:18-CR-215** |
| | : | |
| v. | : | **(Chief Judge Conner)** |
| | : | |
| **DEVIN BULLOCK,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

Defendant Devin Bullock ("Bullock") moves the court to suppress evidence obtained following a warrantless arrest and to dismiss Count 1 of his indictment on double jeopardy grounds. (Docs. 25, 37). We will deny both motions.

## I.    Findings of Fact[1]

Around 11:00 p.m. on September 30, 2016, Harrisburg Police Officer Nicholas Ishman ("Officer Ishman") received a phone call from Dauphin County Probation Officer Brandon Reigle ("Reigle"). (Tr. 2:5-12, 4:5-12, 7:22-24, 8:9-12). Officer Ishman was familiar with Reigle from working with him on previous occasions and knew that Reigle was reliable. (Id. at 8:3-8, 18:16-20). Reigle explained that he had received a tip from a confidential informant that Bullock was spotted at Club 1400 in Harrisburg, Pennsylvania, with a firearm. (Id. at 8:12-16, 9:14-19, 18:24-19:3). Reigle described Bullock's attire as "dark jeans, a gray sweatshirt, and a dark hat."

---

[1] The following factual narrative derives from testimonial evidence adduced during the suppression hearing in this matter, together with exhibits submitted by Bullock. Citations to hearing exhibits are abbreviated as "Def. Ex." The court reporter has provided the court with a rough transcript of the June 10, 2019 suppression hearing. Citations thereto are abbreviated as "Tr. __." Pagination of the rough draft may vary from pagination of the official transcript.

(Id. at 8:17-20). Officer Ishman was familiar with Bullock from working in the "uptown" area of Harrisburg. (Id. at 9:3-17).

Officer Ishman and his partner immediately drove to Club 1400, intending to enter the bar, make contact with Bullock, and investigate the situation. (Id. at 8:24-9:2, 9:20-24). Officer Ishman's partner knew that Bullock's criminal history made him a person not to possess firearms. (Id. at 10:3-6). While driving to Club 1400, Officer Ishman checked Bullock's docket sheets from the Pennsylvania Unified Judicial System's website, which indicated that Bullock had past convictions for burglary and robbery, confirming that Bullock was prohibited from possessing a firearm. (Id. at 10:6-18).

When Officer Ishman and his partner arrived at Club 1400, they parked their vehicle pointing in the direction of the bar and waited for backup to arrive. (Id. at 10:25-11:9). Several minutes later, Bullock—wearing clothes that matched Reigle's description—emerged from the bar and began walking eastbound toward Calder Street. (Id. at 11:1-2, 10-16, 25:2-7). Officer Ishman drove in the same direction and, shortly after turning onto Calder Street, saw Bullock getting into the driver's seat of a parked Lexus SUV. (Id. at 12:2-5, 19-22, 13:8-9). Officer Ishman stopped his vehicle in the middle of the street facing Bullock's SUV so that his lights would illuminate Bullock's car. (Id. at 12:23-13:11). As Officer Ishman began to exit his vehicle to approach Bullock, he saw Bullock's right shoulder rise and then both shoulders and arms dip below the dashboard. (Id. at 13:12-14:16). Believing Bullock's movements to be indicative of removing a firearm from the waistband area, Officer Ishman drew his gun and began yelling at Bullock to put his hands in

2

the air.  (Id. at 14:18-15:18, 31:7-11).  After a few seconds' hesitation, Bullock brought his hands up from below the dashboard and put them above the steering wheel.  (Id. at 16:2-11).

As Officer Ishman approached Bullock's driver's side door, which was still open, he noticed the back sights and grips of a handgun protruding from under the driver's side floor mat.  (Id. at 16:13-17:4, 26:23-27:5).  The back of the handgun was visible because the floor mat had caught on Bullock's foot, causing the mat to lift as Bullock was stepping out of the SUV.  (Id. at 16:23-17:4, 17:14-16, 30:12-31:2).  Upon seeing the handgun, Officer Ishman handcuffed Bullock and took him into custody.  (Id. at 17:13, 18-20, 31:23-24).  The handgun was then recovered from the vehicle and Officer Ishman's partner provided Bullock with his Miranda warnings, which Bullock waived.  (Id. at 17:24-18:4, 32:6-16; Def. Ex. 100 at 7:17-24, 18:6-15).  Bullock admitted that the gun was his during a post-arrest, on-scene interview by the arresting officers.  (Tr. 18:5-6; Def. Ex. 100 at 7:20-23, 18:16-20).

## II. **Procedural History**

A federal grand jury returned a three-count indictment charging Bullock with, *inter alia*, possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1) (Count 1).[2]  Bullock pled not guilty and moved to suppress all evidence stemming from the September 30, 2016 seizure and arrest.  The court convened a suppression hearing on June 10, 2019, during which only Officer Ishman testified.  Bullock

---

[2] Counts 2 and 3 of the indictment are unrelated to the September 2016 incident and were subsequently dismissed by the government.  (See Docs. 83, 84).

3

separately moved to dismiss Count 1 of the indictment, arguing that the federal prosecution violated the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution. The motions are fully briefed and ripe for disposition.

## III. Discussion

### A. Motion to Suppress Evidence

Bullock contends that the police lacked legal authority to seize him on the night in question. He posits that this unlawful detention led to an unlawful warrantless arrest, which precipitated his incriminating statements and the officers' illegal seizure of the firearm from his vehicle. We disagree.

The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. See U.S. CONST. amend. IV; Horton v. California, 496 U.S. 128, 133 (1990). Unlike a warrantless arrest, which demands probable cause, an investigative detention only requires reasonable suspicion of wrongdoing. United States v. Navedo, 694 F.3d 463, 467-68 (3d Cir. 2012). Reasonable suspicion exists if the law enforcement officer can identify "specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion," or, in other words, "raise a suspicion that the particular individual being stopped is engaged in wrongdoing." Id. at 468 (alterations in original) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968); United States v. Cortez, 449 U.S. 411, 418 (1981)). When determining whether an officer possessed reasonable suspicion for an investigative detention, courts must consider the totality of the circumstances, including the officer's "knowledge, experience, and common sense judgments about human behavior." Id. at 468

(quoting United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002)). Reasonable suspicion "unequivocally demands" that the detaining officer have "a particularized and objective basis" for suspecting the person detained of criminal activity. United States v. Brown, 448 F.3d 239, 246 (3d Cir. 2006) (citation omitted).

We have no difficulty finding that Officer Ishman had reasonable suspicion to detain Bullock. Officer Ishman received information from a trusted probation officer that Bullock was spotted at a bar with a firearm. That officer also described the clothing that Bullock was wearing. Officer Ishman's partner knew Bullock was not permitted to possess firearms, and Officer Ishman confirmed this fact while driving to the bar. Shortly after the officers arrived at Club 1400, Bullock exited the bar wearing attire matching the description provided. When Officer Ishman stopped his vehicle on Calder Street near Bullock's SUV to investigate the situation, he witnessed Bullock making movements that, in Officer Ishman's training and experience, indicated that Bullock was removing a firearm from his waistband and placing it on the floor of the vehicle.

These specific and articulable facts, when taken together with Officer Ishman's knowledge and experience, raise a reasonable suspicion that Bullock was engaged in wrongdoing, *viz.*, possessing a firearm illegally. Consequently, Officer Ishman was permitted to briefly detain Bullock for further investigation. When Officer Ishman moved closer to the open driver's side door and Bullock's foot lifted the floor mat to expose the back portion of the handgun, that reasonable suspicion ripened into probable cause to arrest. Because Bullock was lawfully detained and

then lawfully arrested, there was no Fourth Amendment violation that would implicate suppression of evidence.[3]

### B.    Motion to Dismiss Count 1

In a separate motion, Bullock argues that the instant prosecution under 18 U.S.C. § 922(g)(1) violates the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution.  Bullock asserts that he was already penalized for the September 30, 2016 gun possession when his federal supervised release was revoked due to the filing of state charges stemming from this incident.  Bullock maintains that the 18-month revocation sentence he received was intended to punish his illegal gun possession and therefore Count 1 of the instant indictment must be dismissed on double jeopardy grounds.

Bullock's argument is plainly contradicted by United States Supreme Court and Third Circuit precedent.  The Fifth Amendment guarantees the right not "to be twice put in jeopardy of life or limb" for the same offense.  U.S. CONST. amend. V.  In Johnson v. United States, 529 U.S. 694 (2000), the Supreme Court explained that it "attribute[s] postrevocation penalties to the original conviction."  Johnson, 529 U.S. at 701.  Thus, Bullock's revocation sentence was not punishment for the September 2016 firearm possession, but "part of the penalty for the initial offense" for which he was on supervised release.  See id. at 700; United States v. Turlington,

---

[3] Bullock's suppression motion relies exclusively on the unlawful detention argument, contending that evidence obtained after the detention is fruit of the poisonous tree.  However, if there is no "poisonous tree," there can be no illegal fruit.  See United States v. Smith, 552 F.3d 305, 306 n.2 (3d Cir. 2008).

696 F.3d 425, 427 (3d Cir. 2012). None of the cases relied on by Bullock alter this well-settled maxim. We conclude that double jeopardy does not prohibit the government from prosecuting Bullock under Section 922(g)(1) for the September 30, 2016 incident. Hence, we will deny Bullock's motion to dismiss Count 1 of the indictment.

### IV. Conclusion

We will deny Bullock's motion (Doc. 25) to suppress evidence. We will likewise deny his motion (Doc. 37) to dismiss Count 1 of the indictment. An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated: June 28, 2019